**FLEXWOOD CO. et al. v. MATT G. FAUSSNER & CO.**

**No. 8351.**

Circuit Court of Appeals, Seventh Circuit.
Nov. 6, 1944.

Wallace R. Lane, Ralph M. Snyder, and Carl F. Geppert, all of Chicago, Ill., for appellant.

Wm. F. Freudenreich, Russell Wiles, George A. Chritton, and Bradford Wiles, all of Chicago, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and BARNES, District Judge.

BARNES, District Judge.

The plaintiffs-appellees, The Flexwood Company, which is the owner of the two patents in suit, and United States Plywood Corporation and The Mengel Company, which are joint exclusive licensees under the patents, sued the defendant-appellant, Matt G. Faussner & Company, charging infringement and asking an injunction and accounting. The patents are Elmendorf 1,819,775 for a Flexible Wood-Faced Sheet Material, issued August 18, 1931, on an application filed January 24, 1929, and Elmendorf 1,778,250 for a Method of and Apparatus for Treating Flexible Wood-Veneered Material, issued October 14, 1930, on an application filed March 27, 1929.[1] The trial court adjudged the patents valid and infringed.

---

[1] The portions of the specifications of the patents, necessary for an understanding of the claims in suit, and the claims, are as follows:

*Elmendorf 1,819,775:*

"* * * Viewed in one of its aspects the present invention may be said to have for its object to produce a material comprising a flexible backing and a facing of thin wood veneer glued thereto, wherein the veneer shall have no capacity for curling or tendency to curl.

"Or, viewed in another aspect, the present invention may be said to have for its object to produce a pliable material comprising a flexible backing and a wood veneer facing glued thereto.

*        *        *        *        *        *

"In carrying out my invention I make the veneer limp by dividing it, throughout its entire area, into narrow strands or filaments, extending in the direction of the length of the grain. Consequently there will be no such coherence between one part of the sheet and adjacent areas as is necessary to bring about a natural curling or waving of the veneer. In other words I so far destroy the character of the veneer that it becomes limp transversely of the grain. And, since the filaments all hang together in the finished product and the veneer retains its sheet form, this treatment of the veneer to make it limp may take place before or after it is glued to the flexible paper or other material, and it may be done by tearing or splitting along lines extending in the direction of or following the grain. A very simple way is simply to draw the glued product over a knife-like bar with a blunt edge, while holding the material taut and causing it to bend where it passes over the bar; the grain of the veneer running approximately parallel to the length of the bar over which the sheet is drawn. When this is done, with the paper or other backing material next to the element over which the sheet is being drawn, the outer face of the sheet, that is the veneer, is placed under a tension sufficiently great to cause the veneer to be stressed beyond the point of rupture across the grain; and consequently the veneer will be divided into filaments 3 of various lengths and widths, following the grain, hanging togeth-

The defenses urged here are: (1) That the defendant's product and the method of making it were disclaimed by Elmendorf; (2) that the defendant's product and the method of making it are different from those disclosed and claimed in the patents and are not infringements; (3) that the claims are invalid for want of patentable novelty; (4) that the claims are invalid because their sole point of novelty is stated in functional language and lack the distinctness and particularity

er and bonded to the backing. The lines of rupture, of course, do not extend in exact parallelism to the edge, over which the material is drawn; but, beginning at some point therein at the said edge, follow the grain of the wood. *The sharper the edge over which the sheet is drawn, the narrower will be the filaments into which the veneer is divided* and the *flatter the veneer will lie, or, in other words, the more limp the product will be.* However, notwithstanding that the veneer is divided into many very narrow strips or filaments, the lines separating the filaments are practically invisible when the sheet is flattened out, because the combined surface areas of the filaments equal the area of the sheet lying flat, and each filament is in intimate contact with and meshes perfectly with the rupture contour of the adjacent filaments between which it lies.

"In Figure 1 of the drawings, that part of the sheet to the left of the bend 4 has not yet been worked, and the veneer is still in its virgin state. *As the sheet is progressively drawn over a rigid edge, (not shown), causing a sharp wave or curve 4 to travel along the sheet, generally parallel with the grain in the wood, the wood is progressively stressed beyond the rupture point and, therefore, splits or tears to transform the sheet of veneer into a mass of narrow, connected strands or filaments 3. When the sheet is flattened, after being drawn past the said edge, the slits close, so as to be invisible to the naked eye.*

\*       \*       \*       \*       \*       \*

"\* \* \* *Furthermore, by reason of the fact that the veneer may be said to be divided into tiny strips or strands, namely, to be in a lace-like form no variation in the moisture content of the veneer, either before or after it has been applied to a wall or the like, will cause a distortion of the surface contour of the veneer.*

\*       \*       \*       \*       \*       \*

"I do not wish to be limited to any particular way of bringing about a partial disintegration of the veneer or the division of the veneer into filaments, but intend to cover the improved material regardless of the manner in which it is produced. Furthermore, I do not wish to be limited to any particular thickness of veneer, *for the thickness of the veneer will not only vary for different woods but also to suit the particular purpose for which the final product is to be used. Ordinarily thin veneer hav-*

*ing thicknesses of from one-fortieth of an inch to one-eightieth of an inch will be found to be satisfactory for most purposes.*

"I claim:—

"1. A material consisting of a flexible backing and a sheet of thin wood veneer glued thereto, the veneer being in a ruptured state wherein at least the face of the veneer is composed of a mass of small strands or filaments whose rupture contours follow the wood grain in close mesh with each other and cause the surface of the veneer to appear to be continuous when the material is laid flat.

"2. A material consisting of a flexible backing and a sheet of thin wood veneer glued thereto, the veneer being in a ruptured state wherein the face of the veneer is composed of a mass of small strands or filaments whose rupture contours follow the wood grain in close mesh with each other, the size of the strands or filaments and the depth of rupture in the wood being such that the veneer no longer has capacity to curl under changes in its moisture content." (*Italics supplied.*)

Elmendorf 1,778,250:

"In my prior application, Serial No. 334,865, filed January 24, 1929, I have disclosed a novel material comprising a flexible backing faced with thin wood veneer whose structure has been broken down to such an extent that the veneer will have no tendency, when dry, to curl up. The present invention has for its object to make it possible rapidly and at a small cost to treat the veneer so that it will possess the aforesaid characteristic.

"The treatment of the veneer to place it in a condition such that it will have no tendency to curl under moisture and temperature changes or, in other words, to render it limp, because of the frail character of the veneer, can best be effected after the veneer has been glued to its backing. Therefore, viewed in one of its aspects, the present invention may be said to have for its object rapidly and economically to treat a flexible material faced with thin wood veneer so as to render the veneer limp or, in other words, destroy its capacity for curling, without marring the appearance of the surface of the veneer when the product is laid flat.

"In carrying out my invention, beginning at one end of the sheet, I place the face of one narrow strip extending in the general direction of the grain after another

required by statute; (5) that failure to file a supplemental oath to cover new matter rendered the product patent void; and (6) that plaintiffs, by concerted action, are employing the patents and others to secure a monopoly in unpatented materials and are violating the anti-trust statutes.

■ Unquestionably, there were proceedings in the Patent Office on the applications which ripened into the patents in suit which had the effect of narrowing the claims finally allowed, and, unquestionably, the plaintiffs cannot have a construction of the allowed claims which would make them equivalent to those relinquished in order to secure the grant.

In the application for 1,819,775, the applicant stated that "In carrying out my invention I make the veneer limp by dividing it, throughout its entire area, into narrow strands or filaments, *preferably but not necessarily* extending in the direction of the length of the grain." and "It may be done by *crushing between rolls or otherwise, or by cutting,* tearing or splitting *along parallel lines or* along lines extending in the direction of the grain." Nine claims were filed with the original application. After rejection of these and other claims the applicant canceled the words *"preferably but not necessarily",* the words *"crushing between rolls or otherwise, or by cutting,"* and the words *"along*

---

under sufficient tension across the grain to cause the veneer to split; thus progressively breaking up or partially disintegrating the veneer. *The narrower each individual section or strip is, the more numerous will be the breaks in the veneer and more truly limp will the veneer become.* This may conveniently be done by simply bending the sheet, with a flexible backing on the inner side, in such a manner that the veneer must split.

\*  \*  \*  \*  \*  \*

"Referring to Figs. 1 and 2 of the drawings, A represents a flexible backing faced with thin wood veneer B; both the backing and the veneer being shown on a greatly enlarged scale. 1 is a bar having at the top a more or less blunt edge 2; the thickness of the bar being also exaggerated. Laying the sheet on the bar, as shown in Fig. 1, with the wood on top, and then pressing down on the sheet on the opposite sides of the bar, a condition illustrated in Fig. 2 will be brought about. If the forces acting on the sheet are such that in the process of bending it over the edge, the outer face of the wood is stretched beyond the rupture point, the wood will split part way through or all the way through. The veneer usually splits at a considerable number of places along the bar, because the grain seldom runs along straight parallel lines across the sheet; the more or less radial lines *b* in Fig. 2 indicating such breaks in the veneer. Of course, when the curved part of the sheet is flattened again the breaks or slits will close and be invisible for all practical purposes. However, the veneer, so treated, has been rendered limp and impotent so far as the capacity to curl is concerned.

"In practice, after the sheet has once been bent over the edge or bar, it need simply be pulled, while so bent, across the latter, so that the veneer will be progres-

sively broken up from one end of the sheet to the other.

\*  \*  \*  \*  \*  \*

"*If the radius of the edge on the bar is too great there will be no appreciable splitting of the veneer. With a very small radius, on the other hand, the breaks in the veneer will be many and they will be close together.*

"I do not wish to limit myself to any particular degree of fineness in the disintegration of the veneer because for some uses the breaks may be farther apart than for others. *It is possible, however, by making the radius of the edge over which the sheet is drawn small, to produce breaks that will be an average distance of a thirty-second of an inch or less apart.*

"I claim:—

"1. The method of making pliable a sheet composed of a flexible backing faced with wood veneer, which consists in splitting the veneer to divide the face thereof into many narrow filaments whose long edges follow the grain of the wood.

"2. The method of making pliable a sheet composed of a flexible backing faced with wood veneer which consists in breaking the veneer at least through the outer face along closely-spaced lines following the grain.

"3. The method of treating a sheet composed of a flexible backing faced with wood veneer, which consists in manipulating the sheet so as progressively to stress the veneer across the grain past the rupture point.

\*  \*  \*  \*  \*  \*

"5. The method of progressively partially disintegrating the veneer on a sheet, consisting of a flexible backing and a facing of wood veneer, so as to render the veneer limp, which consists in manipulating the sheet so as to place one narrow section of the veneer after another, under sufficient stress transversely of the grain to cause the veneer to split." (*Italics supplied.*)

*parallel lines or,"* and in his cancellation stated—

"There is only one form that applicant's product may take, and that is the one that is the result of a rupturing across the grain through a stressing of the wood, without crushing or compressing and without wedging adjacent sections apart, as must result from the use of a knife to cut into or through the wood."
that—

"It may be that, as the specification was originally drawn, too wide a range of equivalent methods was suggested, because of a fear that the product might possibly be obtained in some other way, and applicant did not wish to take the risk of having his product claims limited. The specification has been revised so as to eliminate all reference to cutting or crushing, because neither cutting nor crushing can produce applicant's product."
and that—

"The material would be useless unless the strands or filaments are so small and mesh with each other so exactly that the sheet appears to have a continuous surface which will lie flat and will not have any capacity to warp or curl."

By the foregoing and other amendments to the specifications, and by the claims which appear in the patent, the patentee expressly limited his patent much beyond its original disclosure.

During the prosecution of the application which ripened into 1,778,250, the applicant made amendments that had the effect of. limiting that patent. Claims 1 and 2 were amended by striking out the words shown below in italics and inserting the words shown below in parenthesis:

"1. The method of making pliable a sheet composed of a flexible backing faced with wood veneer, which consists in (splitting) *partially disintegrating* the veneer to divide the face thereof into many narrow filaments (whose long edges follow the grain of the wood)."

"2. The method of making pliable a sheet composed of a flexible backing faced with wood veneer which consists in (breaking) *dividing* the veneer at least through the outer face along closely-spaced lines (following) *extending in the general direction of* the grain."

In making this amendment, the applicant said:

"As revised, claims 1 and 2 are believed to be allowable. Applicant's process of course has for its purpose to produce flexibility without leaving visible lines of division. This can only be done by breaking or tearing or splitting the wood. * * *

"The only feasible way of producing the product desired by applicant is to split or break or tear the wood, thereby forming breaks that are completely closed the moment the sheet is laid flat."

Both claims of 1,819,775 call for the veneer of the product to be in a ruptured state wherein "the face of the veneer is composed of a mass of small strands or filaments whose rupture contours follow the wood grain in close mesh with each other." The patentee says he does not wish to be limited to any particular way of division of the veneer into filaments but intends to cover the improved material regardless of the manner in which it is produced. He does say that:

"A very simple way is simply to draw the glued product over a knife-like bar with a blunt edge, while holding the material taut and causing it to bend where it passes over the bar; the grain of the veneer running approximately parallel to the length of the bar."

Claims 1, 2, 3 and 5 of 1,778,250 call for methods which consist: "in splitting the veneer;" "in breaking the veneer;" "in manipulating the sheet so as * * * to stress the veneer * * * past the rupture point;" and "in manipulating the sheet so as to place * * * the veneer * * * under sufficient stress to cause the veneer to split."

The defendant denies infringement both of the product patent and the method patent. The same reason is assigned in each case,—that in the making of defendant's product, the wood veneer is neither split, broken nor stressed beyond the rupture point, but, on the contrary, is merely compressed, crushed and expanded. This reason, even if the facts necessary to support it were established, would hardly be sufficient in the case of the product patent.

We agree with the trial court's conclusion that the defendant's product

infringes both claims of the product patent. The samples of the defendant's product in evidence disclose that the veneer therein is in a ruptured state wherein the face of the veneer is composed of a mass of small strands or filaments whose rupture contours follow the wood grain in close mesh with each other and cause the surface of the veneer to appear to be continuous when the material is laid flat, the size of the strands or filaments and the depth of rupture in the wood being such that the veneer no longer has capacity to curl under changes in its moisture content. The defendant is in error when it says that its product is merely compressed and crushed and the patentee stated a fact when, in his communication to the Patent Office, he said "neither cutting nor crushing can produce applicant's product." It is true that defendant's product is somewhat expanded, but so is the product of the patent. A sheet of the product of the patent is wider than the untreated sheet by the aggregate of the widths of the breaks in the sheet. This fact is not inconsistent, and, on the contrary, is entirely consistent with the statement in the patent that "the combined surface areas of the filaments equal the area of the sheet lying flat."

We also agree with the trial court's conclusion that the defendant's method infringes claims 1, 2, 3 and 5 of the method patent. The defendant "splits," "breaks," "manipulates the sheet so as to stress past the rupture point," and "manipulates the sheet so as to place the veneer under sufficient stress to cause to split" the veneer. The defendant, in employing the method of the patent, uses two pairs of intermeshing horizontally arranged corrugated rolls, so spaced with respect to each other that the material passing between them will be "split," "broken" and "manipulated" the desired amount. The rolls of each pair are arranged one above the other and the two pairs of rolls are so arranged with respect to each other that the depressed portions of the corrugations in the veneer made by the first pair of rolls become the upper portions of the corrugations in the veneer made by the second pair. It is obvious that each pair of rolls in the machine used by the defendant in practicing the method of the patent is but a multiple of the devices for practicing the method shown in Figures 7 to 10 of the patent:

The defendant insists that its method is one of crushing and expanding and not of splitting, breaking or manipulating. We cannot agree. It seems to us obvious that such, if any, crushing and such expanding as takes place in the practice of defendant's method (and for that matter in the practice of the method of the patent) is merely incidental and does not contribute to the making of "a material comprising a flexible backing and a facing of thin wood veneer glued thereto, wherein the veneer shall have no capacity for curling or tendency to curl." One, and perhaps the principal, purpose of wood veneer is to give the appearance of solid wood without the expense thereof, and any crushing or expanding of the veneer has a tendency to destroy the appearance of solid wood.

The defendant does not contend that the patents in suit were anticipated but it does contend that the claims are invalid for want of patentable novelty, and it cites the patents and the process in the photographic art to which reference is hereafter made.

Hansen 1,433,077 teaches the cutting of rows of incisions or perforations in wood veneer following the grain to prevent warping and the use of alum solution to remove the marks, but teaches nothing of the preservation of the appearance of unmarred wood otherwise.

Childs, British, 2,083 teaches the puncturing, to prevent warping, of the thin sheets of wood used in composite board, and nothing of the desirability of following the grain and thereby preserving the appearance of unmarred wood.

Thornton-Packard, British, 133,201, teaches the cutting of veneer after its application to fabric and nothing of the prevention of warping or of the desirability of following the grain.

Stoltey, 974,536 teaches the placing in veneer of a series of parallel weakening grooves running approximately lengthwise of the grain, not however for the purpose of preventing warping or for the purpose of preserving the appearance of the wood but for the purpose of expanding the wood much in the way metal is expanded.

Fontainemoreau, British, 11,716 teaches of a method of and apparatus for merely pasting wood veneer on cloth and nothing of preventing warping and at the same time preserving the appearance of wood.

Silver, 438,246 teaches the cementing to fabric of strips of veneer having beveled edges and nothing of the prevention of warping and nothing of the preservation of the appearance of unbroken wood.

Apoll, 382,852 teaches the scoring or cutting of thin boards to prevent warping, but nothing of the preservation of the appearance of unmarred wood.

Jumeau, 593,326 teaches the making of incisions across the fibres of the wood or the cutting of the surface into squares to prevent warping, but certainly nothing about following the grain so as to preserve the appearance of unmarred wood.

Perkins, 76,244 relates to a fabric composed of lamina of wood and either paper, paper-pulp or textile material. The patentee says the lamina must be moistened before unrolling in order to avoid splitting and that the fabric must be rolled lengthwise of the grain for a like reason. Nothing is taught about preventing warping.

Hale, 333,408 relates to a flexible curtain made by cementing wooden slats to one or both sides of a canvas, the slats being grooved upon one face so as to form a series of narrow beads, so that when the beaded slats have been attached to the canvas they will bend or separate along the lines of the grooves. There is no teaching concerning the prevention of warping.

Hansen, 863,988 relates to a leaf for books having a flexible band formed of a plurality of scores, made by running the sheet over the serrated edge of a bar or comb so as to fracture the sizing of the paper and destroy its compactness. Wood veneer is not involved and consequently there is no problem of warping and no problem of preserving the appearance of unmarred wood.

Wolff, 785,786 discloses a machine for making corrugated wood sliver, including means for preventing fracture of the fiber and means for keeping the sliver in corrugated form. The machine disclosed in the patent in suit does almost exactly the opposite.

Rice, 215,162 teaches the calendering of wood veneer to make it "tough, strong, pliable, and smooth" by passing it between a pair of heated, revolving, highly-polished, hollow metal cylinders. Nothing is taught about preventing warping or the desirability of splitting or breaking the veneer into narrow filaments whose long edges follow the grain of the wood.

Proctor, 1,657,280 teaches the process of making ply wood tubes which consists of winding spirally under pressure rotary cut veneer on a core with the average direction of the grain parallel to and what was originally the concave side nearer the axis of the tube with intervening layers of glue and then placing the core and tube in a mold until the glue sets. The patent teaches nothing of the breaking or splitting of the veneer into narrow filaments to make it pliable and prevent warping.

The defendant in its brief says:

"The whole concept of both of the Elmendorf patents is the making of a sheet of veneering material (consisting of an old flexible backing and a wood veneer glued thereto), in which the upper surface of the wood veneer is ruptured, by splitting or breaking it, along lines which follow the grain by bending it over the rigid edge of a bar only to such an extent that when the sheet is laid flat after being split, the filaments of the veneer will closely mesh and the splits close and be practically invisible, *and the sheet will be of the same dimensions as it was before the splitting was done.*"

We think that this statement is accurate with the exception of that part thereof which we have italicized. If the following words from lines 22 to 24 of page 2 of 1,819,775 "because the combined surface areas of the filaments equal the area of the sheet lying flat," are substituted for

the italicized words the statement as so modified will, in our opinion, be accurate. Elmendorf proposed that this be done in order to make a product which would resemble unbroken wood veneer or unmarred wood and which would be flexible, would not warp, and consequently would not pull plastering from walls to which it might be applied as a covering.

Fontainemoreau, British, 11,716 shows that wood veneer was combined with cloth as early as 1847 and the desirability of accomplishing the purposes of Elmendorf had been known for many years but no one prior to Elmendorf disclosed a product or a method of making a product which would accomplish those purposes. Were Elmendorf's discoveries inventions? We think they were. They were new and novel and the history of the art tells us that they were beyond the skill of the mere artisan. Had they not been, the recognized need would have led some mechanic to the discovery long before Elmendorf's time.

Before leaving the question of invention, we should perhaps refer to a suggestion of the Patent Examiner, made in the course of the prosecution of the application for the product patent, upon which the defendant relies. The Examiner said:

"One surface of the photograph bears a gelatin coating impregnated with photographic chemicals. On drying this surface curves so as to lie inward. It is an old process in photography to take a photograph thus dried and to bend it in a reversed direction over a straight edge. By doing this fine cracks are made on the finished gelatine surface which close on recoil of the paper. Such process seems quite analogous to applicant's and is the solution of an analogous problem."

To the Examiner's suggestion the applicant made what to us seems to be a complete answer, as follows:

"Apparently these old practices did not teach the solution of applicant's problem, because the practices and the problem went along side by side, apparently strangers to each other, for a half a century or more. At any rate, the thought must occur that a cracked photographic film is really something so remote from a wall covering of wood that the existence of one would not preclude the grant of a patent on the other."

In short, the art of working photographic films and the art of making wall coverings by combining wood veneer and cloth are not analogous.

■ We cannot agree that the claims in suit are invalid because of the use of so-called "functional language" therein or because of the lack of distinctness and particularity required by statute. The defendant complains of the italicized words in the following phrases and clauses: "wherein *at least* the face of the veneer," "a *mass of small* strands or filaments," "in *close* mesh," and "cause the surface of the veneer *to appear* to be continuous when the material is laid flat," in claim 1; and "*a mass* of small strands or filaments," "in *close* mesh," and "the *size* of the strands or filaments and the *depth of rupture* in the wood being such that the veneer *no longer has capacity to curl* under changes in its moisture content," in claim 2, of 1,819,775, as being indefinite and as lacking particularity and distinctness. The words "at least" do not seem to us to be indefinite or as to lack particularity or distinctness. On the contrary, they seem to us to be exceedingly definite, particular and distinct. The word "mass" is, we think, definite, particular and distinct. The word "small" might without the context be considered indefinite and to lack particularity and distinctness, but, in the light of those portions of the specifications of 1,819,775 which we have set forth and italicized in the note hereto can not, in our opinion, properly be subjected to that criticism. We do not understand how the defendant applies his criticism to the words "to appear." In fact, we do not see how the patentee could have made the phrase more definite, particular and distinct unless it would have been by adding the words "to the naked eye," and we do not think that was necessary. The word "close," modifying the word "mesh" might, standing alone, be considered indefinite and to lack particularity and distinctness, but, in the light of the specifications, cannot, in our opinion, properly be subjected to that criticism. The clause "the size of the strands or filaments and the depth of rupture in the wood being such that the veneer no longer has capacity to curl under changes in its moisture content" is "functional language", but the claim in which this language appears is for means sufficiently specified and described in the claim and specifications, and, accordingly, the claim is not invalidated as being for a function by the recital therein of the function to be performed or the result to be served by such

means. We believe that the clause under consideration, read in the light of the specifications, has the particularity and distinctness required by the statute.

Of the claims of 1,778,250 in suit, the defendant says that the vague statements and the functional language at the sole point of novelty renders each of them invalid. The defendant calls attention to the following language and the italicized words: in claim 1, *"splitting* the veneer to divide the face thereof into *many narrow* filaments"; in claim 2, *"breaking* the veneer *at least through* the outer face"; in claim 3, *"manipulating* the sheet"; and in claim 5, *"partially disintegrating* the veneer" and *"manipulating* the sheet so as to place *one narrow section* of the veneer after another, under *sufficient* stress transversely of the grain *to cause the veneer to split".* We do not think this is functional language. The words, "splitting," "breaking," "at least through," "one," "section," and "to cause the veneer to split" cannot in our opinion be said to be vague. The words, "many narrow," "manipulating," "partially disintegrating," "narrow," and "sufficient" might, without their context, lack particularity and distinctness, but, in the light of those portions of the specifications of 1,778,250 which we have set forth and italicized in the note hereto cannot, in our opinion, be said to be vague.

■ Claims must, of course, "clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise" (United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 170, 87 L.Ed. 232) and, in our opinion, claims should be held to do so if in the light of the specifications and the state of the art they tell one skilled in the art with reasonable clarity what the patentee claims as his invention.

■ The patentee amended his application for the product patent during its prosecution. The rules of the Patent Office require that "when an applicant presents a claim for matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath." The amendments here presented claims for matter substantially embraced in the statements of invention or claims

originally presented and accordingly no supplemental oath was required.

We have now considered all of the issues that have been subjected to the winnowing processes of a trial court. After all the briefs were in in this court and six days before the day set for oral argument here, the defendant filed, and later brought to the attention of the plaintiffs, its petition "to have this court consider the agreements between the plaintiffs and plaintiffs' testimony which show that plaintiffs by concerted action are employing the patents in suit and others to secure a limited monopoly of unpatented materials and that plaintiffs are violating the anti-trust statutes of the United States."

No such issue was made by the defendant's answer in the trial court, apparently the matter was not presented to or considered by that court, no findings were made by it on the issue, no mention is made of the issue in defendant's statement of points to be relied upon in this court, the three contracts between the plaintiffs are not included in the printed record, and no mention is made of the issue in the first two briefs filed here by the defendant.

Plaintiffs, in their memorandum filed in answer to defendant's aforesaid petition, say that defendant's counsel, in concluding his opening statement on the trial, said that, judging from the title papers and licenses which they had been privileged to see, a conspiracy had been entered into by the plaintiffs to fix prices and to maintain a monopoly beyond that permitted under patents, that the doctrine of unclean hands would become pertinent and that it might be necessary to ask leave to amend the pleadings. This statement was not considered of sufficient importance to require its being made a part of the record.

We do not feel that it is fair to the parties, to the public, to the trial court, or to the reviewing court to ask the reviewing court to consider an issue of the importance of that now presented without the issue having first been presented to a trial court, so that it may be made definite and certain and the evidence and arguments pertinent thereto may be sifted and ordered.

■ The court now may return the case to the trial court in order that it may consider and decide the issue now presented for the first time.[2] To do this, will,.

---

[2] In fairness to counsel it should be said they have not asked us to take this course.

however, reward or place a premium on delay in the presentation of a defense. For this reason, we have decided against this course. The alternative is to decide the question presented by defendant's motion on the record already made.[3] This, we shall do, and, in so doing, we are not unmindful of the interest of the public in questions relating to the validity, infringement and lawful use of patents. That interest we understand to be that justice shall be done to the patentee, the alleged infringer and the public, bearing in mind the public policy expressed in Section 8, Article I of the Constitution of the United States to the effect that "The Congress shall have Power * * * to promote the Progress of Science and useful Arts, by securing for limited Times to * * * Inventors the exclusive right to their respective * * * Discoveries" and the acts of the Congress enacted in pursuance of such authority.

The defendant bases its contention on a consideration of three contracts between the plaintiffs, or their predecessors in interest, and a very few other items of evidence. The Flexwood Company, predecessor in interest of The Flexwood Company, one of the plaintiffs, and sometimes hereinafter referred to as "Licensor," United States Plywood Co., Inc., predecessor in interest of United States Plywood Corporation, another of the plaintiffs, and The Mengel Company, the third plaintiff, the two corporations lastly mentioned being sometimes hereinafter referred to as "Licensees," made a written contract, dated June 2, 1932, and amended it by writings dated March 31, 1933, and December 22, 1934, respectively. An abstract of the three contracts is set forth in the margin.[4] The only other

---

[3] Since writing the above, the writer's attention has been called to the opinion of this court in Container Patents Corporation v. Stant, 143 F.2d 170, 172, where a third, and undoubtedly the best, course was followed. There, of a defense like unto that now under consideration, the court said:

"As to this defense, it is sufficient to say that it was not presented to the court below and it cannot be presented here for the first time. New York Life Ins. Co. v. Calhoun, 8 Cir., 114 F.2d 526, 543; Ramming Real Estate Co. v. United States, 8 Cir., 122 F.2d 892; Hutchinson v. Fidelity Investment Association, 4 Cir., 106 F.2d 431, 436, 133 A.L.R. 1061; Towle v. Pullen, 7 Cir., 238 F. 107, 111."

[4] The recitals and provisions of the three contracts make it clear that at the time of and prior to the execution by the plaintiffs or their predecessors in interest of the first of such contracts, The Flexwood Company owned a going business in the manufacture and sale of a wall covering known as "Flexwood" and for the purposes of that business owned machinery and equipment and an inventory of materials for the manufacturing of "Flexwood", and also owned eight patents (including the two in suit), and seven applications for patents, which patents and applications The Flexwood Company represented to be all the patents and applications which it had covering "Flexwood" and the methods of manufacturing it and the machinery used in such manufacture, and also owned two registered trade-marks for "Flexwood." The first contract recites that United States Plywood Co., Inc., and The Mengel Company desired to acquire from the Flexwood Company the exclusive right and license to manufacture, sell and distribute "Flexwood" and other products which may be made and sold under said trade-marks and patents and patent applications.

By the three contracts, The Flexwood Company (1) agreed to cease to manufacture, sell or distribute the products above described, (2) granted to the other parties the exclusive right and license to manufacture, sell and distribute the product known as "Flexwood" and any other product that might be made, sold and distributed under any of the trade-marks, letters patent or applications therefor above described, and (3) would assign all existing sales agreements to the other parties thereto. It was provided in said contracts that unless sooner terminated as therein provided, the contracts and the license granted and the royalty to be paid should be effective until the latest expiration date of the patents described or referred to.

By these contracts, United States Plywood Co., Inc., and The Mengel Company (1) acknowledged the validity of all patents "above" described, and (2) agreed to pay to The Flexwood Company an amount "hereinafter called royalty equal to 10% of the gross sales of 'Flexwood' and any other wood veneer, wall covering or other material similar in character and general use to 'Flexwood'".

The contracts provide that Licensees should have the right and duty to use the name "Flexwood" on all material of the kind on which Licensor "now" uses said name; that all other products manufactured, sold and distributed by Licensees under the license granted should be sold under such trade names or marks as might be agreed upon by the parties but all such should be the property of Licensor; that

items of evidence to which the defendant refers on the issue now under considera-tion are those which are likewise set forth in the margin.[5]

on termination of the agreement by cancellation or breach the Licensees should cease the use of the name "Flexwood" and such other trade names and marks; and that on termination by expiration Licensees should have the right to continue to use the name "Flexwood" and such other trade names and marks and should pay to Licensor for such right five per cent. of gross sales.

Licensees agreed to use their best efforts to dispose of Licensor's inventory of materials and on its sale were to pay therefor Licensor's cost of production. Said inventory was, at Licensees' expense, to be shipped to the New York warehouse of one of the Licensees.

The Licensor's machinery and equipment was, at Licensor's expense, to be dismantled and shipped to the other Licensee's plant at Louisville and there used in the manufacture of the licensed products. Such machinery and equipment was to remain the property of the Licensor, was to be leased to Licensees for ten years at $3000 per year, and, at the end of said period, and on payment of the entire rental, was to become the property of Licensees. In the event of the termination of the agreement before the expiration of ten years, the Licensees were to return the machinery to Licensor.

Licensees were to complete all orders on the books of Licensor.

The agreement provided that it and the license might be cancelled on thirty days notice to Licensees in the event of any material breach by Licensees, and that if Licensees failed diligently to prosecute the manufacture, sale and distribution of "Flexwood" Licensor might by notice demand the payment of a minimum royalty of $20,000.

The agreement provided that it might be cancelled by Licensees without cause at any time on 30 days' notice and that in the event of such cancellation or in the event of cancellation by Licensor or Licensees for any of the causes entitling either to a cancellation, then Licensees should not thereafter manufacture, sell or distribute any product similar to the materials covered by the agreement except as follows: Licensees might continue to operate the business for a period of not less than six months for the purpose of liquidating inventories and completing orders and contracts. During such period no royalty was to be paid. In case of notice of cancellation by either party, the parties should co-operate to the end that Licensees might be able to liquidate their investment in Flexwood without unnecessary losses and that the business as a going enterprise might be preserved for Licensor, including the maintenance of normal prices for Flexwood, so that Licensor should not be unreasonably damaged during the transition period following the cancellation. To that end it was provided that during said six months' period the prices on Flexwood which may be in effect at the time of service of notice of cancellation should be maintained except as reductions might be consented to by Licensor. The contract further provided that at the end of said six months' period Licensor should have an option, effective for 10 days after Licensees had furnished Licensor with a list of such remaining inventory of Flexwood, to purchase all or any part thereof at Licensees' manufacturing cost price. If within said six months' period Licensor decided either to resume the manufacture of the licensed materials or to license others to do so, it should purchase from Licensees at the end of said six months' period their remaining inventories of single ply veneer and coated cloth used in the manufacture of Flexwood, at Licensee's cost price. Any remaining inventories after the exercise of Licensor's option might be liquidated by Licensees in any manner and at whatever prices Licensees should elect. If at any time after notice of cancellation Licensor notified Licensees that Licensor had decided neither itself to resume the manufacture of the licensed materials, nor to license others to do so, all restrictions on Licensees' method of liquidating said inventories should thereupon be removed.

[5] One Hardy, president of The Flexwood Company, testified on direct on behalf of plaintiffs: "After the original Flexwood Corporation was formed, it manufactured Flexwood for itself. It marketed the material for two and one-half years. Then the arrangement was made by the agreements which I have produced to license U. S. Plywood and The Mengel Company to take over the actual operations of both manufacturing and selling. As soon as the contracts were concluded, the machinery was moved from Chicago to the Mengel plant at Louisville, Kentucky, and manufacturing started as soon as that moving had been completed and has continued ever since that time. In other words, The Mengel Company manufactured the material and the U. S. Plywood Company sold the material. That is the present procedure. * * * I have kept myself informed from 1932 to date as to what competitive products were being met by Flexwood. The only product that I have seen of a similar

■ The defendant complains because the two Licensees have a joint exclusive license. Possibly such a license might under some circumstances be a vehicle for illegal action but we find nothing in the circumstances of this case to indicate illegality.

The defendant says the Licensees are required to pay royalties and use trade marks to be agreed upon on unpatented and old

---

nature, outside of the present product under discussion, was the product that was sold by a company called the Smith Veneer Company known as Lastic Veneer, or an electric (elastic?) product of some kind, I have forgotten just exactly the name they sold it under. Apparently that veneer had been treated with a number of fine little cuts which were obvious to the eye." On cross-examination, the witness testified:

"Q. Do you know anything about the prices, the list price agreements between The Flexwood Company and the Plywood Company and also The Mengel Company, and in that connection you might glance at the instruction sheet on the last page of the document you hold in your hand, Plaintiffs' Exhibit 14. A. Yes.

"Mr. Snyder: May I have a copy of that, and I will give it to the Judge. (Handling document to the Court.) I will just refer you to that.

"Q. What were the arrangements, if you know, with respect to the prices to be charged? A. The Plywood Company, which was the selling agent had complete freedom as to prices which they could sell the product for. This paragraph that you referred to here is a way of defining the actual amount of royalties which Flexwood would get. To make that point a little clearer, when Flexwood opened up an elaborate office in New York the royalties that we received were not 10 per cent of the prices they got but 10 per cent of the wholesale price. In other words, if an item was sold at wholesale to other jobbers throughout the country at a certain price, we were only entitled to 10 per cent of that wholesale price and not 10 per cent of the retail price that Flexwood might get in selling direct out of its New York office.

"Q. Were you advised from time to time of the prices that were fixed by Plywood and Mengel? A. No.

"Q. Mengel was the manufacturer and he sold to Plywood and Plywood sold to the trade? A. To make that a little clearer, the U. S. Plywood Company was purely a selling agency which had worked very closely with The Mengel Company acting as The Mengel Company's sales agency for selling Plywood. *When this arrangement was made it was practically a joint venture between the U. S. Plywood Company and The Mengel Company and they agreed to put in jointly what capital was necessary and if there were profits to divide the profits and if there were losses to divide*

*the losses.* So as a practical matter Plywood sold and Mengel manufactured and it is one operation from their account.

"Q. Now again referring to the question which I do not believe you have quite answered, when Mengel changed its prices they reported that to you on this royalty agreement, did they? Just how did they set that up so that you knew that you were getting the amount? A. There was no way of determining that except as we had audits made of their books, which we did in one case, just to test the thing. Outside of that there was no test.

"Q. And that revealed the price? A. Yes.

"Q. But you knew what prices they were charging, did you not? A. Not particularly, no. We would merely receive each month a statement that they had sold so much Flexwood for so much money and our royalties were 10 per cent of that sum.

"Q. What was their retail price, the price on which you got royalties, as compared with the price that Flexwood was charging when Flexwood was manufacturing and selling the product? A. Their prices were higher. They started, as I recollect it, at prices about the same as Flexwood. The day that the arrangement was made between The Flexwood Company and The Mengel Company and Plywood Company, Mr. Ottenger explained to Colonel Mengel in my presence that he hoped under their auspices that Flexwood could be expanded into a volume item. That is what they were interested in, was volume, and that they hoped to be able to sell it through wall paper houses and hoped to get the cost down.

"Q. Who is Mr. Ottenger? A. Mr. Ottenger was president of the U. S. Plywood.

"Q. Now what connection—A. To follow up that point as to prices, he found after a few months experimentation with the product and with the marketing problems, instead of reducing the prices that he had originally planned, *they had to raise the prices and they were raised very substantially thereafter.* In other words, he became convinced it never could be made a volume item, it had to be a specialty.

"Q. Then the fact is after the payment of royalties began to you, prices were actually raised? A. But not until a period of test had been made.

"Q. Well, how long? A. Oh, I think, that was several months.

materials. This is an inaccurate statement. As we have seen, the Licensor owned a going business in the manufacture and sale of a wall covering known as Flexwood. It made a contract whereby it turned over to the Licensees its going business, its outstanding contracts, its machinery and equipment, its inventory of materials, its patents, patent applications and trade marks, and the Licensees agreed to pay therefor, among other things, "An amount which is hereinafter called royalty equal to 10% of the gross sales (as hereinafter defined) of Flexwood and any other wood veneer, wall covering or other material similar" in character and general use to Flexwood. We see nothing illegal in this consideration.

The contract between the plaintiffs provides that it may be canceled by the Licensor for a breach by the Licensees and by the Licensees without cause, on thirty days' written notice, and that in the event of cancellation in accordance with its terms, Licensees shall not thereafter manufacture, sell or distribute, any product similar to the materials covered by the agreement except during a six months' period provided for liquidation of Licensees' inventories, and that in case of cancellation the parties shall co-operate to the end that the Licensees may be able to liquidate their investment without unnecessary losses "and that the business as a going enterprise may be preserved and conserved for Licensor, including the maintenance of normal prices for the Flexwood so that the Licensor shall not be unreasonably damaged during the transition period following the cancellation of this agreement. To that end it is agreed that during said six (6) months following

"Q. Not more than a year? A. No.

"Q. Now what can you tell the Court with respect to the prices that were charged by the Plywood Company as compared with the prices that were given in the last page of Plaintiffs' Exhibit 14, it is that letter. A. I guess I have lost it here. Your question again?

"Mr. Snyder: Would you read the question, please? (Question read.)

"A. At that time that this was entered into or this supplement agreement was made in 1933, January 1933, and the reason for this supplement being made six months after the original contract was formed, the Plywood Company, as I recall the incident, had already determined that the price structure had to be up as compared with our original prices. They had lost very substantial money during the first six months trial period, and that one of their problems was that the New York office, which they were opening up and running themselves and which had substantial expenses connected with it, and this was therefore an effort to determine on what bases royalties would be based. In other words, if the New York office sold Flexwood, say, at 40 cents or 50 cents or 60 cents, Flexwood would merely get 10 per cent royalties on the base price for a similar product sold to another distributor, such as a Chicago distributor.

"Q. I don't believe you quite understood the purport of my question. Were the prices charged at a subsequent period to this letter more or less than the price that is fixed in this letter? A. Were the prices charged at a subsequent period to what?

"Q. To the date of this letter, and this letter is dated January 12, 1933. A. The prices that are charged to-day as compared with the prices—

"Q. Any time subsequent to the date of the letter? A. Subsequent is—

"Q. Later. A. Later. That I have no knowledge of. I would assume they were not less and may be more."

On January 12, 1933 the Licensees wrote the Licensor a letter as follows:

"With reference to the agreement entered into June 2, 1932 between your Company and the United States Plywood Company and The Mengel Company, and particularly with reference to Paragraph numbered 4 thereof we beg to state that royalties on Flexwood manufactured by The Mengel Company and sold either by The Mengel Company or the United States Plywood Company, will be figured and paid as follows:

"The prevailing list prices of Flexwood shall be discounted by all the discounts to which any one is entitled at the time a sale is made and the royalty will be ten (10%) per cent of the price so arrived at after deducting all rebates, adjustments, governmental, state or Federal Sales and excise taxes, or of lower prices if Flexwood is sold to net lower prices. For example, at the present time, the list price on standard Flexwood is forty (40¢) cents per square foot, the present prevailing discounts from list are 20%, 25%, 12½% and 2%. For the present, transportation charges will not be deducted.

"Referring to Paragraph 6 of the same contract, it is further understood that no royalty will be paid you on Flexwood manufactured by your company, and which Flexwood either has been sold or may hereafter be sold by The Mengel Company and/or the United States Plywood Company."

the effective date of cancellation, the prices on Flexwood which are in effect at the time of service of notice of cancellation, shall be maintained, except as reductions may be consented to by Licensor."

■ Is the restriction on Licensees' right after cancellation to manufacture, sell and distribute any product similar to the materials covered by the agreement valid? It is unlimited both as to time and space. This question, because of the time and manner of its presentation, has not had the careful attention to which it is entitled. The Flexwood Company, which first became a party to the contracts in question, was a Delaware corporation having its principal office in Illinois. Its successor, the corporation of that name, which is one of the plaintiffs, is also an Illinois corporation having its principal office in that State. United States Plywood Co., Inc., which first became a party to the contracts in question, was a New York corporation, having its principal office in that state. Its successor, United States Plywood Corporation, is likewise a New York corporation, having its principal office in that state. The Mengel Company is a New Jersey corporation, having its principal office in Kentucky. The cases in the Supreme Court of Illinois hold that "contracts in general restraint of trade are void, as being contrary to public policy" (See Storer v. Brock, 351 Ill. 643, 184 N.E. 868, 869, and cases there cited.) The restriction in question may or may not be valid. The specific question before us is, Does the presence of this restriction, which we shall assume to be illegal, in the contract between the plaintiffs, or their predecessors in interest, for (among many other matters) the purchase and sale of a going manufacturing business, machinery, equipment and inventory, so soil the hands of the plaintiffs that they may not, so long as the restriction remains in effect, prosecute a suit for infringement of two patents under which licenses are granted by said contract? To answer this question in the affirmative would, in our opinion, stretch the doctrine of unclean hands as a defense further than it has yet been stretched in any case to which our attention has been called, and further than we believe it should be stretched.

■ Is the agreement that, during the period of six months following the effective date of cancellation, the prices on Flexwood which are in effect at the time of service of notice of cancellation, shall be maintained, illegal? Taking into account the purpose of this price maintenance agreement as expressed in the contract to preserve and conserve the business as a going enterprise for Licensor, so that it shall not be unreasonably damaged during the transition period—we cannot, on the record before us, say it is illegal. The defendant to the contrary notwithstanding, this is the only agreement to maintain prices we find in the evidence.

■ The defendant contends that the plaintiffs, United States Plywood Corporation and The Mengel Company, concertedly fixed prices with the approval of The Flexwood Company, and they say the letter of January 12, 1933 (which is set forth in the note) is evidence of this fact. We cannot agree. That letter merely evidenced an agreement between the Licensor and Licensees as to the discounts which should be deducted in determining the "gross sales" upon which the percentage royalty was to be paid. It would probably be a fair inference from the evidence that The Mengel Company, the manufacturer, and United States Plywood Corporation, the distributor, agreed upon the prices to be paid by the latter to the former. It would be extraordinary if they did not, but, as we have said, on the facts before us, we see nothing illegal in that action, though the parties to it are exclusive joint licensees. It would probably be a fair inference from the evidence that United States Plywood Corporation, the distributor, fixes the prices to be paid by the public. Here again it would be extraordinary if it did not, but there is not a scintilla of evidence in the record from which it may be inferred that either The Flexwood Company or The Mengel Company or both of them fixed or had anything to do with fixing prices to the public except during the so-called "six months' transition period," heretofore considered.

We see nothing illegal in the contracts of which defendant can complain, and nothing illegal in the other actions of the plaintiffs.

■ Perhaps we have unnecessarily labored. Thirteen days after the date of the oral argument plaintiffs filed with us a "Third Amended License Agreement" between the plaintiffs, dated four days after the date of the argument. This new agreement recites that questions have arisen (1) as to the interpretation of the agreement between the parties so far as it relates to the basis for the payment of royalty, (2)

542

as to the validity of limitations on the right of the Licensees after cancellation of the agreement to manufacture, sell and distribute any product similar to the materials covered by the agreement, and (3) as to the validity of provisions for the maintenance of prices on Flexwood during the six months "transition period." By this Third Amended License Agreement, it is provided (1) that the 10% royalty shall be due and payable only upon licensed products covered by the Licensor's patents, and (2) that the limitations on the right of the Licensees to manufacture, sell and distribute products, similar to the materials covered by the agreement as well as provisions for the maintenance of prices shall be eliminated from the contract between the plaintiffs. This amendment, if we have a right to consider it, deprives the defendant of all its causes of complaint, except that concerning the joint character of the exclusive license agreement. We see no reason why we should not consider the new contract. We understand that a reviewing court may always consider evidence presented to it that shows a case has become moot or that a cause of action or a defense has ceased to exist. This principle should certainly be applicable to a defense not presented to a trial court and presented for the first time to the reviewing court. We believe that it is applicable and that defendant's point is now without merit, if it ever had any merit.

The judgment of the District Court is affirmed.